IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>HAOYANG YU, *et al*. | No.  19-cr-10195-WGY |

**MOTION FOR HEARING AND/OR RULING ON SCOPE AND VIABILITY OF CORPORATE ATTORNEY-CLIENT PRIVILEGE CONCERNING EVIDENCE THAT ANALOG DEVICES, INC ("ADI") SENT GDS FILES FOR "CONTROLLED" MMICS TO WIN SEMICONDUCTORS IN TAIWAN WITHOUT AN EXPORT LICENSE AND, THEN, LIED TO THE GOVERNMENT ABOUT IT**

Analog Devices, Inc. ("ADI"), the putative "victim" in this case, has been a driving force behind the federal investigation and criminal prosecution of its former employee, Defendant Haoyang Yu, and his company, Tricon MMIC LLC. The indictment charges, *inter alia*, that on or about July 23, 2018, Mr. Yu and Tricon knowingly and willfully violated U.S. export laws by sending, without a purportedly required export license, computer design (GDS) files to WIN Semiconductors, a specialized foundry in Taiwan, for the manufacture of allegedly "controlled" microchips, TM5051 and TM5052.[1]

As it turns out, ADI engaged in the very same conduct, while Mr. Yu worked there.  Worse, in connection with this investigation and prosecution, through its outside counsel, William Weinreb,[2] ADI lied to the government about its own conduct – falsely claiming it had "the necessary export licenses" – and later failed to correct that misrepresentation, even after ADI

---

[1] Defendants maintain that the GDS files were not "controlled" under the EAR but assume for the sake of argument here that they are, as the prosecution alleges in the indictment.

[2] Now at the law firm Quinn Emanuel, Weinreb is the former Acting U.S. Attorney and former Chief of the National Security Unit, the same group that is prosecuting this case.

1

produced documents, through Weinreb, in response to a subpoena from Mr. Yu, that confirmed ADI did *not* have an export license at the relevant time. Indeed, at the time when ADI sent GDS files, which included designs that Mr. Yu had created, to WIN to fabricate actual chips, ADI had not yet even *applied* for a license to transfer that "technology."

Evidence of these facts is both highly relevant and plainly exculpatory. It tends to show that, based on his work experience at ADI, Mr. Yu reasonably believed that an export license was *not* required to send GDS files (even for "controlled" MMICs) to WIN in Taiwan – and that he did not willfully violate any allegedly applicable export regulation concerning such computer files. In addition, it casts doubt on the credibility of the many prosecution witnesses from ADI and the integrity of the entire case.

In this criminal case, Mr. Yu cannot simply compel "ADI" to testify.[3] Instead, he must subpoena individual witnesses. He can subpoena Weinreb[4] to ask who at ADI provided the relevant information, including false statements about licenses, that Weinreb conveyed to the prosecution. Weinreb may then assert privilege concerning such communications, while the defense would contend that any privilege has been waived or is invalid under the crime-fraud exception.

Apart from privilege issues, it would cause undue delay if the defense must await trial testimony by Weinreb to identify other potential ADI witnesses, whom the defense would then need to subpoena separately. Accordingly, the Court should convene an evidentiary hearing at which the defense can question Weinreb about these matters and the Court can rule on any assertion of privilege.

---

[3] *Contrast* Fed. R. Civ. P. 30(b)(6) (permitting deposition of organizational party).

[4] The defense also will likely need to subpoena Weinreb to authenticate other documents produced in response to the defense subpoena to ADI.

## Background

**I.     Without an export license, on or about February 4, 2014, ADI sent GDS files for controlled chips to WIN.**

Mr. Yu worked for ADI from July 2014 through July 2017 as an integrated circuit design engineer. During that time, Mr. Yu worked on designs that ADI sent ("taped out") to WIN for fabrication at its specialized foundry in Taiwan. As the Court has heard, ADI sent computer design (GDS) files, and based on those files, WIN manufactured actual chips on wafers. The prosecution contends that, if the actual chips would be subject export controls, the GDS files are similarly subject to export controls and, thus, require export licenses.

On September 29, 2020, ADI's counsel, William Weinreb, sent an email to AUSA Amanda Beck (cc'ing AUSA Jason Casey and NCIS Special Agent Craig Harrah), in which Weinreb wrote:

> From: Bill Weinreb
> Sent: Tuesday, September 29, 2020 5:30 PM
> To: Beck, Amanda (USAMA)
> Cc: Casey, Jason (USAMA)    Harrah, Craig A
> Subject: RE: US v. Yu: Short conversation with 2 ADI employees
>
> Amanda –
>
> ADI's logs do indicate that it transferred a mask set to Win on or about February 4, 2015, that contained 11 different designs, including designs provided by Yu. One of the designs was the HMC8257, which had an ECCN of 3A001.b.2.c. Peter Katzin was the Director of Engineering and Export Control expert at the time. It is possible that Katzin approved Yu to do the actual file transfer to Win. ADI is confident that it had the necessary export licenses for the transfer.
>
> As a general matter, ADI had in 2015, and continues to have, very strict export control policies and procedures. It maintains a manufacturing license with Win and for many other suppliers, customers, and employees (for deemed exports). Only ADI's Export Compliance team is authorized to make export decisions.

Ex. A. This e-mail was not produced to the defense until February 3, 2022.

**II.    At the time, ADI did not have an export license to send GDS files for "controlled" MMICs to WIN Semiconductors in Taiwan.**

In fact, on February 4, 2015, ADI did *not* have an export license for the transfer of GDS files to WIN for the manufacture of "controlled" MMICs. Indeed, nearly three weeks later, on February 24, 2015, ADI applied for such a license for the very first time, by submitting an online

3

application to the Department of Commerce's Bureau of Industry and Security (BIS) through its SNAP-R portal.

In its application, ADI stated: "As a result of regulatory change in the US EAR, effective on December 23, 2014, the transfer of an 'new' technology shared/transferred as of December 23, 2014 related to the PRODUCTION of MMICs is not eligible for US export under US License Exceptions TSR and/or STA." Sealed Ex B.[5] ADI requested "authorization to share & transfer integrated circuit technology, specifically related to the PRODUCTION of certain Microwave Monolithic Integrated Circuits (MMICs) wafers, controlled by ECCN 3A001.b.2.X." *Id*. In an explanatory letter dated February 24, 2015, and enclosed with the license application, Dennis Farrell, ADI's then-Director of Global Trade Compliance, wrote: "The US EAR regulatory change effective on 12/23/2014 is forcing [ADI] to apply for this license." Sealed Ex. C.

On March 31, 2015, BIS issued the requested export license to ADI. That license authorized ADI to export to WIN "technology for the PRODUCTION of products/commodities controlled under ECCN 3A001.b.2.x," meaning MMICs that operated with certain parameters. It identified the Export Control Classification Number for such technology as 3E001. Sealed Ex. D.

Thus, as these records make clear, on or about February 4, 2015, ADI did *not* have an export license to send GDS files to WIN for the manufacture of "controlled" MMICs. ADI did not apply for that license until February 24, 2015, and BIS did not issue it until March 31, 2015. Further, through its counsel, ADI misrepresented that critical fact, when it told the prosecutors in this case: "ADI is confident that it had the necessary export licenses for this transfer."

---

[5] In producing these documents pursuant to subpoena, ADI requested that they be treated as "confidential" under the protective order in this case. Accordingly, defendants have provisionally filed them under seal. However, defendants do not believe that these documents should remain sealed, particularly since they consist of documents submitted to and obtained from the Department of Commerce.

4

**III.     ADI has since failed to correct its false statements, even after the true facts must have been apparent to the company and its counsel.**

On December 17, 2021, pursuant to Fed. R. Crim. P. 17 and with this Court's *ex parte* authorization, Mr. Yu served a subpoena for documents on ADI, demanding, *inter alia*:

1. All documents from 2012-2017, including but not limited to internal ADI communications and communications with the Department of Commerce ("DOC") concerning or comprising: (a) export licenses requested by or issued to ADI, authorizing the transfer of any controlled item or technology to the WIN Semiconductor foundry in Taiwan [and] (b) export licenses requested by or issued to ADI, authorizing the transfer of any GDSII data or "GDS"-format computer file to any country, from 2012-2017.

In response, on February 4, 2022, ADI's counsel, Weinreb, sent a letter to undersigned counsel for Mr. Yu enclosing documents responsive to the subpoena, including documents Bates-stamped ADI-YU00018995 through ADI-YU-00019252. Sealed Ex. E. These materials included the February 24, 2015 application by ADI and the March 31, 2015 license from BIS, both of which plainly post-dated the February 4, 2015 "tapeout" by ADI to WIN of GDS files, for which ADI had no export license.

Given that production, by no later than February 4, 2022, ADI (and Weinreb) knew or reasonably should have known that his September 2020 representation to the prosecution was false. Nevertheless, neither ADI nor Weinreb have corrected that misrepresentation (or if they have, the prosecution has failed to disclose that exculpatory information to the defense).

**Argument**

Mr. Yu and Tricon are charged with unlawful exports of GDS files for allegedly "controlled" MMICs to WIN Semiconductors in Taiwan (Counts 18 and 19). The prosecution contends that because the actual chips required an export license, under ECCN 3A001.b.2, the "technology" for WIN to manufacture those chips similarly required an export license, under ECCN 3E001. Thus, the prosecution argues, Mr. Yu and Tricon should have obtained an export

5

license for their GDS files and, further, that their failure to do so constituted a federal crime – a "willful" violation of U.S. export law.

The prosecution contends that Mr. Yu learned about export controls when he worked at ADI, because he received training on that subject. As the Court has heard, however, the training that Mr. Yu received was outsourced by ADI to a third party, SAI Global, Inc., and it was low quality. As Akash Mathur, an employee of SAI, testified, Mr. Yu received a single substantive training during his entire time at ADI, and that online course did not even mention the Commerce Control List ("CCL") or explain how the CCL's detailed provisions might apply to particular MMICs or GDS files.

Moreover, ADI's actual export practices concerning the "tape out" of GDS files to WIN were at least as important as its purported export training, if not more so. The fact that, when Mr. Yu worked at ADI, the company sent GDS files *without an export license* – including Mr. Yu's own chip designs – to WIN for the manufacture of "controlled" MMICs is relevant to whether Mr. Yu reasonably believed that only actual chips, not the related design files, required licenses. Indeed, Weinreb's email of February 4, 2020, indicates that Mr. Yu may have been directed, personally, to send the files to WIN by ADI's then-Director of Engineering and Export Control, Peter Katzin, at a time when ADI had no license to do so. In light of that personal experience as ADI's employee, Mr. Yu would have reasonably believed an export license was not required to send Tricon's GDS files to the very same foundry.

In addition, ADI has not been a passive victim in this criminal case. Rather, it has been an active participant in the investigation and prosecution of Mr. Yu and Tricon. As this Court has heard, ADI performed various investigative functions, including examining and opining on evidence obtained from Mr. Yu's home, seized mail, and elsewhere. It has been ADI, rather than

the FBI or any other federal law enforcement agency, that has performed the critical comparisons that purport to show Mr. Yu's files or Tricon's chips are copies of ADI's property. Many witnesses against Mr. Yu and Tricon are ADI's current or former employees. And ADI's counsel, Weinreb, has been attending trial almost every day and conferring regularly with the prosecutors at breaks, including while witnesses from ADI have been on the stand during their examinations.

The credibility of ADI – and its employees – is a critical issue for the jury to consider in this case, both witness-by-witness and writ large. ADI's misrepresentations about having an export license to send GDS files to WIN on or about February 4, 2015, bear on that issue. If false statements were made on ADI's behalf to the prosecution, those statements may have violated 18 U.S.C. § 1001. If ADI's employees made false to ADI's counsel, with an understanding that the information would be shared with the prosecution in connection with this case, those statements may have violated 18 U.S.C. § 1512(b)(3). At a minimum, the failure of ADI and its counsel to correct earlier misstatements (*i.e.,* that ADI had a license to export GDS files as of February 4, 2015) when later information came to light in connection with the subpoena response (*i.e.,* that BIS did not issue such a license until March 31, 2015) raises issues regarding duty of candor. *See* Mass. R. Prof. C. 3.3, 4.1. And arguably, in the unique circumstances of this case, ADI and its counsel, a longtime former prosecutor, are members of the "prosecution team" with obligations under *Brady v. Maryland*, 373 U.S. 83 (1963), and *Kyles v. Whitley*, 514 U.S. 419 (1995).

The import of this issue is magnified by the recent testimony of John Blount, a former employee of Hittite Microwave Corp. (which was acquired by ADI) and later founder of Custom MMIC. Although the fact was not disclosed by the prosecution before Blount testified, he admitted on cross-examination that, prior to 2019, his own company also sent GDS files to a foreign foundry for the production of "controlled" MMICs without an export license. Blount dismissed his

company's failure to obtain an export license for its tape out of Custom MMIC's CMD242 as the honest mistake of a growing company.

```
2   Q.  It's because it never occurred to anybody that you
3       might need a license for a GDS file?
4   A.  It was something that we came to terms with later
5       on, yes.
6   Q.  In 2019, right?
7   A.  Yes.
8   Q.  After Mr. Yu had been charged in this case, right?
9   A.  It had no bearing on his charging, it was just us
10      getting better as a company and understanding the law.
```

5/16/22 Tr. at 74.

The prosecution has used Blount, like many other purported "lay witnesses," to offer their opinions about the MMIC industry, including how designers create chips and how companies manufacture them with the assistance of foreign foundries. While only Mr. Yu and Tricon stand accused of stealing trade secrets and violating export laws, it has become clear that many of the witnesses against him have engaged in similar conduct with impunity.[6]

Accordingly, the Court should hold an evidentiary hearing at which the defense can question Weinreb about these facts, identify ADI witnesses who may have provided false

---

[6] It is difficult to understand how the prosecution was unaware of this important fact – that Blount and his company, Custom MMIC, engaged in the same conduct for which Mr. Yu and Tricon are being prosecuted – given that all three prosecutors met with Blount on April 25, 2022, and according to the FBI report, asked him whether Custom MMIC has "ever submitted an export license to ship items outside of the United States." Ex. F. According to the report, during the meeting, Blount claimed that he could not recall, but on the following day, he advised the prosecution that Custom MMIC first obtained export licenses to send GDS files to foreign foundries, including WIN in Taiwan, in 2019. Given that Blount founded Custom MMIC in 2006 and that the company was selling export-controlled MMICs long before 2019, it was incumbent on the prosecution ask the obvious follow-up question: had Blount and Custom MMIC sent GDS files for "controlled" MMICs to foreign foundries without an export license? Indeed, they did, as Blount reluctantly admitted on cross-examination.

information to Weinreb, and rule on any assertions of privilege.

Weinreb's statements to the prosecution about ADI's purported compliance with export laws waived any privilege as to the information upon which Weinreb relied and the identity of the persons (presumably, ADI's employees) who provided that information. *See Johnson v. 27th Ave. Caraf, Inc.,* 9 F.4th 1300, 1313 (11th Cir. 2021) ("The rule that selective disclosure waives the privilege comes from the idea that the attorney-client privilege is 'a shield, not a sword,' meaning that a party 'may not use the privilege to prejudice his opponent's case' by preventing the disclosure of damaging communications while 'disclos[ing] some selected communications for self-serving purposes.'") (internal citation omitted); *In re Sealed Case*, 676 F.2d 793, 818 (D.C. Cir. 1982) ("[S]elective disclosure for tactical purposes waives the privilege. Disclosure is inconsistent with confidentiality, and courts need not permit hide-and-seek manipulation of confidences in order to foster candor."); *Mag Jewelry Co. v. Cherokee, Inc.*, No. 04-174T, 2005 U.S. Dist. LEXIS 53358, at *5 (D.R.I Aug. 12, 2005) (holding a party may not "engage in selective disclosure and waive the privilege only as to beneficial communications") (citing *Rutgard v. Haynes*, 185 F.R.D. 596, 601 (S.D. Cal. 1999) ("A party may not insist on the protection of the attorney-client privilege for damaging communications while disclosing other selected communications because they are self-serving. Voluntary disclosure of part of a privileged communication is a waiver as to the remainder of the privileged communications about the same subject.")). A party may not "selectively disclose fragments [of relevant information] helpful to its cause, entomb other (unhelpful) fragments, and in that way kidnap the truth-seeking process." *XYZ Corp. v. United States*, 348 F.3d 16, 24 (1st Cir. 2003).

Moreover, false information provided through counsel, especially when that information is conveyed to federal prosecutors and agents and arguably obstructs a federal investigation, is

by nature unprivileged under the crime-fraud exception. *See United States v. Gorski*, 807 F.3d 451, 459-62 (1st Cir. 2015); *In re Grand Jury Proceedings*, 183 F.3d 71, 74-78 (1st Cir. 1999).

Finally, as the Court has noted during the trial, Mr. Yu has a Sixth Amendment right to compulsory process in this criminal prosecution. *See Crane v, Kentucky*, 476 U.S. 683, 690 (1986) ("[T]he Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense."); *Taylor v. Illinois*, 484 U.S. 400, 409 (1988) (holding Sixth Amendment protects "the right to present the defendant's version of the facts"); *Pennsylvania v. Ritchie*, 480 U.S. 39, 56 (1987) ("holding "criminal defendants have the right . . . to put before a jury evidence that might influence the determination of guilt"). Mr. Yu's constitutional right trumps ADI's assertion of any common-law corporate privilege. *See United States v. Rainone*, 32 F.3d 1203, 1206 (7th Cir. 1994) (recognizing that, "[e]ven the attorney-client privilege . . . might have to yield in a particular case" if defendant's constitutional rights "would be violated by enforcing the privilege"); *see United States v. W.R. Grace*, 439 F. Supp. 2d 1125 (D. Mont. 2006) (ruling "the attorney-client privilege could in certain circumstances yield to a defendant's Sixth Amendment rights) (citing *Murdoch v. Castro*, 365 F.3d 699 (9th Cir. 1994)).

**Conclusion**

For the foregoing reasons, the Court should convene an evidentiary hearing and rule on any assertions by ADI of the attorney-client privilege concerning its representations, through counsel or otherwise, regarding its own export licenses for GDS files.

10

Respectfully submitted,

**HAOYANG YU**

by his attorneys,

*/s/ Daniel N. Marx*
William W. Fick (BBO #650562)
Daniel N. Marx (BBO #674523)
Amy Barsky (BBO #601111)
FICK & MARX LLP
24 Federal Street, 4th Floor
Boston, MA 02110
(857) 321-8360
*wfick@fickmarx.com*
*dmarx@fickmarx.com*
*abarsky@fickmarx.com*

Dated: May 19, 2022

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on May 19, 2022.

*/s/ Daniel N. Marx*